## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AARON FRENCH,

    Plaintiff,

    v.

                            Civil Action No.:  SAG-24-739

YESCARE HEALTH CORP., et al.,

    Defendants.

## MEMORANDUM OPINION

Self-represented Plaintiff Aaron French filed this civil rights complaint against YesCare Corp., Dr. Donald Alves, Bruce Ford, P.A. Stephanie Cyran, CRNP, Sharon Causey, RN, and Jennifer Adrion, RN.[1]  Compl., ECF No. 18. He also filed a Motion for Preliminary Injunction. ECF No. 17. In response to the Motion and Complaint, Defendants filed a Motion to Dismiss or Alternatively for Summary Judgment.  ECF No. 30.  French was notified of his right to file a response. ECF No. 31. He sought and received multiple extensions of time to respond to the dispositive motion (ECF Nos. 32, 33, 34, 35, 36, and 37), but to date has not responded. *See* Local Rule 105.6 (D. Md. 2025).  For the following reasons, the Court will grant Defendants' Motion and deny French's request for injunctive relief.

### Background

#### A.  French's Allegations

French filed a Motion for Injunctive Relief (ECF No. 17) seeking medical care to treat a broken thumb.  The allegations contained in the Motion track the allegations contained in his

---

[1] French instituted this case in the Circuit Court for Somerset County, Maryland. ECF No. 4. Defendants removed the case to this Court (ECF No. 1) and subsequently French filed an Amended Complaint (ECF No. 18), which now serves as the operative pleading.

Amended Complaint (ECF No. 18), wherein he also seeks injunctive relief including treatment of his broken thumb and other medical care.

French suffers from high blood pressure and is designated as a chronic care patient. ECF No. 18 at 6.  As such, he is to be seen by a medical provider every 90 days. *Id.* French asserts that "Defendant YesCare failed to follow an established medical treatment plan" entered in July of 2023, resulting in his medications not being filled.  *Id*. at 4-5.

French saw Physician's Assistant ("PA") Bruce Ford in August of 2022 as part of his chronic care treatment. ECF No. 18 at 8.  During that visit, Ford "began a litany of curse words which began to trigger rage in Plaintiff." *Id*. at 8.  French admonished Ford for his conduct and ended the visit. *Id*. French opines that Ford was upset at French's admonishment and caused French to not be seen for 11 months, even though French was supposed to be seen every 90 days. *Id*. at 8. French's medications "expired and ran out by December 2022".  *Id.*

In July of 2023, when French saw a medical provider, the provider indicated it would not be prudent to resume French's previous medication regimen because French had not been seen since August of 2022. The provider ordered blood work to determine the proper course of treatment. *Id*. at 5.  Prior to this appointment, French had been prescribed Chlorthalidone 50 mg, Cozaar 100 mg, Norvasc 10 mg, Robaxin 500 mg, and Tylenol 500 mg. *Id*. at 6. His prescriptions for Chlorthalidone, Norvasc, and Tylenol were continued at the visit, but the balance of the medications were not restarted pending the results of his blood work. *Id.*

The blood work was done in August 2023, but YesCare failed to provide a follow up medical provider visit and the prescriptions for Chlorthalidone, Amlodipine, and Tylenol ran out in September and October of 2023. *Id*. at 6. As a result, French claims he suffered headaches, chest pain, blackout syndrome, and twitching and spasming of his eyes. *Id*. at 7.

On October 30, 2023, Nurse Adrion saw French for a sick call visit, in response to French's sick call slips submitted on October 11 and 24, 2023, concerning the expiration of his prescriptions. *Id.* French advised Adrion that he was suffering pain without his medication, including chest pain, headaches and black out syndrome. *Id*. French asserts that although Adrion was not able to renew or refill his prescriptions, she could have provided him "some Tylenol for his headaches, which she did not." *Id*. at 9. Adrion advised French she would have him scheduled to see a medical provider to address his expired medications. *Id*. at 10. He was also due to have a follow-up provider visit from his July 2023 visit, but he was not seen by a provider until December 7, 2023. *Id.*

On December 7, 2023, French was evaluated by Dr. Ernest Uzicanin, who also forgot to order Tylenol. *Id*. French submitted a sick call on December 19, 2023 and was seen by Adrion on December 28, 2023; Tylenol was ordered. *Id*.

On March 3, 2024, French blacked out in his cell and "in conjunction with an assault by prison correctional officers, was hospitalized for 6 days." *Id*. at 7. French "rationalizes that [the foregoing delay in receipt of medical care] had a cumulative or delayed impact" resulting in his black out in his cell. *Id*. at 11. After the altercation with staff, French was taken to Tidal Health Hospital and admitted to the Intensive Care Unit. *Id*. French claims that Adrion "failed to screen, document, and notify the hospital of [his] injuries." *Id*. at 12. French contends that because he was sedated and could not speak for himself, he was not treated for the injuries he sustained during the use of force, nor were his injuries addressed when he returned from the hospital to ECI. *Id.*

On March 6, 2024, French was admitted to the ECI infirmary for observation. *Id*. at 12. When French attempted to complain of injuries sustained during the use of force, Causey advised

that he would be seen by a provider, and Alves advised that he was only concerned with controlling French's blood pressure and discharging him from the infirmary. *Id*. at 13.

French remained in the infirmary until March 8, 2024. ECF No. 18 at 13. He asserts that Cyran was notified of his medical care and ordered Clonidine, which Causey tried to have French take. *Id*. Causey also took French's blood pressure, which measured 120/80. *Id*. at 13. French asserts that "Defendant [Causey] gave me a false blood pressure read, on March 8, 2024, so that I could be prematurely discharged from the ECI infirmary and Defendant [Causey] could be rid of the duty of treating me and I never seen the provider." *Id*. at 13.

From March 8 to April 5, 2024, French was moved from ECI-East infirmary to ECI-West "lock up." ECF No. 18 at 14. French had access to sick call and "began documenting all the many efforts [he] made to have his assault injuries treated." *Id*.

On March 17, 2024, French was seen for emergency chest pains, which he asserts shows his blood pressure was "likely" not perfect when he was discharged from the infirmary. *Id*. at 14.

From April 5, 2024 until June 27, 2024, French was housed in ECI-East Housing Unit 6. ECF No. 18 at 14. French explains that the ECI East and West compounds have separate medical departments for providing care to inmates who are housed on each side of the compound. *Id*. While housed on the east compound, French continued to seek medical care and was seen in sick call on April 18, 2024, regarding his left thumb. *Id*. at 15. He was advised that he would be referred to a provider. *Id*. However, on June 27, 2024, French was sent to lock up on ECI West Side. Thereafter, until October, 2024, French was transferred between the East and West compounds and did not see a provider regarding his thumb. *Id*.

During his July 3, 2024 chronic care meeting with Ford, French told him about his broken left thumb, genital area rash, and the need to have his blood pressure medicines renewed. *Id*. at 15-

4

16. Ford acknowledged French's concerns and assured him that he would receive x-rays, anti-fungal cream, and renewal of his expired medication, but the only thing that he received was the prescription renewal. *Id*. French asserts that Ford "did not even document nor generate a medical record of this encounter." *Id*. Because of the failure to document the visit, on July 29, 2024, French was again seen by Ford for a chronic care visit and French again requested treatment for his broken finger and rash. *Id*. at 16.

On August 5, 2024, French was released from "lock-up" and moved to Housing Unit 2 on the West compound. *Id*. at 16. On August 12, 2024, French was seen by Defendant Adrion for a sick call even though he had already seen the provider, but he still did not receive treatment for either the genital rash or his thumb. *Id*. at 17.[2]

French seeks compensatory damages and injunctive relief directing "Defendant fix [his] broken left thumb, and ensure that [he] receives 4 chronic care medical provider visits per year and that [his] medication don't ever run out." *Id*. at 18; ECF No. 17.

**B. Defendants' Response**

In support of their dispositive motion, Defendants provide portions of French's pertinent medical records and declarations from Defendants Ford, Alves, Cyran, Causey, and Adrion. ECF Nos. 30-2 through 30-18.

The medical records show that on April 11, 2022, French submitted a sick call slip stating his blood pressure medication expired on March 28. ECF No. 30-7 at 30. There is no record that French requested to refill his medication before the prescription expired. ECF No. 30-2 at 3, ¶ 8.

---

[2] In one of his requests for extension of time to respond to Defendants' dispositive motion, French states that he did receive an x-ray of his thumb in May of 2025. ECF No. 35.

The following day, PA Ford prescribed Robaxin, a muscle relaxer, Tylenol Extra Strength, and amlodipine (Norvasc), a calcium channel blocker to treat high blood pressure, through August 12, 2022. ECF No. 30-6 at 8; ECF No. 30-2 at 3, ¶ 8. At that time, French had active prescriptions for Perphenazine and Diphenhydramine, prescribed by his mental health providers, and Biofreeze, a pain relief gel, Eplerenone, a diuretic used to treat high blood pressure, atorvastatin (Lipitor), a statin used to treat high cholesterol and triglyceride levels, and Benzoyl Peroxide. *Id*.   On April 13, 2022, French saw RN Taylor for medication renewal and his prescriptions for Chlorthalidone, a diuretic used to treat high blood pressure, and Cozaar (losartan), a medication used to lower blood pressure, were both renewed.  ECF No. 30-6 at 7; ECF No. 30-2 at 3, ¶ 8.

Additionally, in April of 2022, French was provided Eplerenone, Lipitor, chlorthalidone, Cozaar, Norvasc, and Tylenol as keep on person ("KOP") medications.  ECF No. 30-11 at 5-7. He also received Robaxin as direct observation therapy, twice daily, throughout April. *Id*.

On May 3, 2022, French submitted a sick call complaining that he had been taking Tylenol and while it provided some relief for his headaches,it did not provide relief for his back and foot pain. He requested an increase in pain medication. ECF No. 30-7 at 26. He received Tylenol 500 mg, as keep-on-person ("KOP") on May 3, 2022. ECF No. 30-11 at 1.

RN Johnson saw French in sick call on May 19, 2022, regarding renewal of Konsyl (fiber), Biofreeze, acne cream, fish oil, Tums, and Zyrtec.  ECF No. 30-6 at 5. He also reported he was to be prescribed stronger pain medication because Robaxin and Tylenol were not effective to treat his pain. *Id*. He was able to walk without difficulty and reported new pain in his knees and continuing "old pain" in his feet and back.  There was no request in the electronic record to change French's pain medication and he had been de-registered from the chronic care pain clinic. *Id.*

On May 20, 2022, French was provided Eplerenone and benzoyl peroxide KOP. ECF No. 30-11 at 3. In July he received Cozaar, Norvasc, chlorthalidone, and Tylenol KOP. ECF No. 30-10 at 33. In May, June, and July he was administered Robaxin twice a day. ECF No. 30-10 at 33, 35; ECF No. 30-11 at 1.

PA Ford examined French on August 4, 2022, during chronic care clinic. ECF No. 30-6 at 1-4. He was being treated for high blood pressure and reported muscle spasms. He asked Ford to reorder the muscle relaxer Robaxin, but it was not available for reorder and the pharmacy recommended Baclofen, another muscle relaxer to replace Robaxin. French refused Baclofen and stated that his pain medication should be upgraded. *Id*. Ford recalls having an argument with French because French insisted on the treatment he requested, became angry, asked to leave, and did so. ECF No. 30-2 at 5, ¶ 12. Ford renewed French's prescriptions for chlorthalidone, Cozaar, Norvasc, nasal spray, and Tylenol ES through December 31, 2022. *Id*. He also ordered that French be scheduled for his next chronic care clinic. *Id.* Ford avers that he has no control over when patients are scheduled. *Id*.

On August 6, 2022, due to Ford's prescriptions, French received Cozaar, Norvasc, chlorthalidone, nasal spray and Tylenol KOP. ECF No. 30-10 at 27, 29. He was administered Robaxin, twice daily until August 12, 2022, when it expired. *Id*. at 29.

On October 6, 2022, French was provided ibuprofen KOP as prescribed by the dentist. ECF No. 30-10 at 23. He received another 30 tablets of ibuprofen, prescribed by the dentist, on October 15, 2022. *Id*. On November 20, 2022, he received Tylenol KOP *Id*. at 19. On December 10, 2022, he was provided Norvasc, Cozaar, and chlorthalidone KOP. *Id*. at 15. The prescriptions expired on December 31, 2022, but French did not request refills through the sick call process. ECF No. 30-2 at 6, ¶ 14. Ford explains that French was educated on how to request and obtain medication

7

refills but he failed to utilize the process before or after his medication expired on December 31, 2022. *Id*.

Dr. Asresahegn Getachew saw French on July 3, 2023 via telemedicine, assisted by a nurse. ECF No. 30-5 at 30-33.  French's blood pressure was 139/100. *Id.* He stated that he ran out of his medications and was therefore not taking them. *Id.*  He denied chest pain or shortness of breath but experienced occasional headaches. *Id.* He was educated on the importance of taking his medication as prescribed, increasing physical activity, and reducing salt intake. *Id.* While French reported suffering from chronic back pain, he also reported doing burpees and squats, which Dr. Getachew counselled could aggravate his back pain and advised French to avoid. *Id.* No muscle weakness was observed on examination and French's movements were normal. *Id.* French also suffered from chronic kidney disease and his creatine was 1.6 in 2021. No recent labs were available, so new blood work was ordered. *Id*. Additionally, French's last A1C was 6, and a new A1C test was also ordered.  Dr. Getachew assessed French as suffering from uncontrolled hypertension and back pain.  He ordered a complete metabolic panel, and complete blood count with differential and platelet count and scheduled a follow-up visit for October 3, 2023. *Id*. Dr. Getachew prescribed chlorthalidone until September 30, 2023 and Norvasc and Tylenol until October 30, 2023. *Id.* The following day, French was provided Norvasc, chlorthalidone, and Tylenol KOP.  *Id* at 614. On July 11, 2023, his labs were taken. ECF No. 30-14 at 783-84.

On September 26, 2023, French received Norvasc, chlorthalidone, and Tylenol KOP. ECF 30-9 at 31.  The following day, he signed a form educating him how to refill KOP medications (ECF No. 30-6 at 22) and he also received ibuprofen KOP as prescribed by the dentist. ECF No. 30-9 at 33.

Custody requested French be seen for an unscheduled visit on October 4, 2023 due to his complaints of dizziness and feeling like passing out. ECF No. 30-5 at 26-27. RM Desir evaluated French, who reported not feeling well since dinner and taking Tylenol. His blood pressure was 100/60 and his vital signs were within normal limits. He denied any COVID symptoms. The nurse noted he would call medical in the morning for re-evaluation by a provider, but no record of a follow up encounter is in French's medical records. *Id*.; ECF No. 30-2 at 7, ¶ 18. That same day, French signed another form regarding the process for filling KOP medications and received another 30 tablets of ibuprofen. ECF No. 30-6 at 20, ECF No. 30-9 at 29.

On October 23, 2023, French filed a sick call stating that his chronic care clinic was overdue and his medications were not controlling his blood pressure. ECF No. 30-7 at 21. He was evaluated by RN Adrion[3] on October 30, 2023. ECF No. 30-5 at 20-25. His blood pressure was 122/90. He complained of headaches in his eyes and forehead, reporting ten out of ten on a pain scale. He stated that aspirin improved the symptoms but then it returned. He was oriented and his movement and grip strength were normal. *Id*. He was educated about the risks of taking too much aspirin. He was assessed as suffering from pressure behind the eyes and involuntary blinking. It was noted that he had hypertension. He reported being out of his medications such as Cozaar (losartan) and chlorthalidone since last year and having chest pains on and off since October 3, 2023. An EKG was completed and faxed to the provider, NP Roderer, who noted that it showed no significant changes compared to his EKG on October 1, 2019. French's examination was otherwise unremarkable. Adrion noted that French was to follow up with a provider the next day. *Id*.

---

[3] Jennifer Adrion is a Registered Nurse who was employed by YesCare Corp. as a registered nurse at ECI until July 31, 2024, and continues to work for Centurion as a registered nurse. ECF No. 30-18 at ¶ 2.

Adrion avers that she referred French to a provider after her examination on October 30, 2023. ECF No. 30-18 at ¶ 8. She explains that "when a provider follow-up is selected in the nursing protocols in the computer, it tasks the order for the patient to be scheduled for a provider visit in the task box as a safety measure to ensure patients are scheduled. However, it appears that on October 31, 2023, another nurse mistakenly rescheduled him for October 30." *Id*. Adrion provided a copy of a "screen shot" demonstrating she scheduled French to be seen on October 31. *Id*., ¶ 9.

On December 7, 2023, Dr. Uzicanin saw French in chronic care. ECF No. 30-5 at 16-19. French complained of variable retrosternal discomfort over the past several months, and back pain and hypertension, which he reported having for 20 years. *Id*. at 16. His blood pressure was 135/90. Dr. Uzicanin prescribed chlorthalidone, Cozaar, and Norvasc to treat hypertension, Zocor for hyperlipidemia, Meloxicam for musculoskeletal pain, and Prilosec for GERD, through April 12, 2024. French's EKG showed first-degree AV block, normal sinus rhythm, and no acute ST/T changes. *Id*. at 18; ECF No. 30-9 at 19.

French received Zocor, Norvasc, chlorthalidone, Meloxicam, and Cozaar KOP on December 10, 2023, ECF No. 30-9 at 23. On December 20, 2023, he received hydrochlorothiazide (HCTZ) KOP through February 5, 2024. ECF No. 30-11 at 37. HCTZ is also used to treat hypertension. ECF No. 30-2 at 9, ¶ 22.

On December 19, 2023, French submitted a sick call slip, which was received by medical on December 23, complaining that he saw a provider on December 7, but the provider forgot to reorder Tylenol. ECF No. 30-7 at 20. French asked that his Tylenol be increased to 500 mg for chronic headaches and pain associated with hyper-tension. *Id*. French saw Adrion in sick call on December 28. ECF No. 30-5 at 13-15. His blood pressure was 142/90. French reported not taking

his blood pressure medication yet. He also reported that Meloxicam was not relieving his headaches and other aches and pains and requested Tylenol 500 mg. *Id*. He walked with a steady gait and was not in distress. Adrion notified Dr. Alves of French's request and he prescribed Tylenol 325 mg. through February 5, 2024. *Id*.; ECF No. 30-12 at 2.  On December 29, 2023, French received Tylenol as prescribed. ECF No. 30-12 at 2.

On January 20, 2024, French received Zocor, Norvasc, Meloxicam, Cozaar, HCTZ, and Tylenol KOP. ECF 30-11 at 33-37. The medications were prescribed through February 5, 2024. *Id*.

On February 5, 2024, NP Roderer evaluated French in the chronic care clinic. ECF 30-5 at 9-12.  At that time, French complained of foot and back pain as well as occasional headaches. At that time he was on three medications to control his hypertension: Roderer noted that the medications were starting to bear out in his renal function. His blood pressure was 135/88. Roderer assessed French as suffering from hypertension and ordered labs. She renewed his prescriptions for Cozaar, Excedrin (for headaches), HCTZ, Meloxicam, Norvasc, Tylenol ES, and Zocor. All medications were prescribed KOP and were valid through June 15, 2024. *Id*.  French received the Excedrin and Tylenol as KOP the following day. ECF No. 30-12 at 18, 20. His labs were drawn on February 8 and 23, 2024. ECF 30-14 at 17-22.

French was seen again by Roderer on February 28, 2024, for a routine physical.  ECF No. 30-5 at 1-4. Roderer reviewed French's labs with him and noted he was prescribed Cozaar, Norvasc, and HCTZ, but his blood pressure at 152/84 was still above his goal.  An EKG was done and showed sinus rhythm with first degree AV block. Roderer planned to decrease the dosage of HCTZ, keep the dosages for Cozaar and Norvasc the same, and add 2 mg doxazosin in the evening. She directed he return in one month for a blood pressure check and they could increase the

doxazosin dose if needed. Additionally, Roderor noted that French would stay on Zocor. recommended rechecking his lab work in a month to verify his renal function was at baseline. She prescribed doxazosin and HCTZ KOP through July 6, 2024. He already had active prescriptions for Cozaar, Excedrin ES, Meloxicam, Norvasc, Tylenol ES, and Zocor KOP through June 15, 2024. *Id*. French was issued  HCTZ 25  mg KOP on February 29, 2024. ECF No. 30-12 at 28.

On March 3, 2024, French was evaluated by RN Adrion due to his altered mental status. ECF No. 30-4 at 35-37. Medical was notified of a suspected overdose and responded to HU2 with a stretcher, emergency jump bag, and AED. Upon arriving in the unit, Adrion saw French, naked and screaming and swinging his arms at correctional officers, who then sprayed French with pepper spray. Adrion waited until French was handcuffed to enter the tier because of safety concerns. French was placed on a back board and covered with a blanket. He was carried to medical where his vitals were obtained. He was awake blinking, frothing at the mouth, and trying to mouth breathe. To protect his airway he was turned on his side, which increased his ability to breath. Sputum was wiped from his mouth. He screamed spontaneously. As staff attempted to ask him questions, he tensed up, and held his breath until he could no longer hold it. He would not answer questions or follow simple directions.  He occasionally tried to get off the stretcher. He had a bump on his left forehead, lacerations to his right shoulder, right wrist, and left big toe, and an abrasion on his left knee. The provider was called and ordered French sent to the hospital via 911. EMS was given reports upon arrival but because of French's erratic behavior, EMS called for another ambulance to medically sedate him. While awaiting the other ambulance, French expressed that he was in pain from being handcuffed and due to his position. Once the other EMS staff arrived, French was given an injection and fell asleep. He was taken on a stretcher to

ambulance. Adrion called Tidal Health and gave a report regarding French's condition to a Registered Nurse. *Id.* at 36-37; ECF No. 30-18 at ¶ 10.

After arriving at  Tidal Health, French  was admitted to the ICU and, because of his agitation, providers started a propofol drip. ECF No. 30-8 at 1-37 An EKG, chest x-ray, urine tox, and brain CT were each negative. On March 4, 2024, French was weaned from sedation and extubated. He was at his baseline sensorium and was downgraded to the medical floors. His blood pressure medications were incrementally resumed and he was described as tolerating his medications well.  French was diagnosed with: (1) acute kidney injury, with elevated creatinine; (2) rhabdomyolysis, a condition where the skeletal muscles break down and release harmful substances into the bloodstream; (3) hyperlipidemia; (4) uncontrolled hypertension; and (5) acute encephalopathy. He was to continue simvastatin for hyperlipidemia and Cozaar, doxazosin (Cardura), HCTZ, and Norvasc for hypertension. It was noted that correctional staff reported French took K2 at ECI,[4] and that a head CT and infectious workup were negative. He was discharged on March 6, 2024. *Id.* French did not voice any complaints regarding his thumb while he was in the hospital. *Id.*

French returned to ECI on March 6, 2024, around 5:39 p.m., and was seen by RN Causey. ECF No. 30-4 at 30-31. His blood pressure was 197/109 and his heart rate 127. Dr. Alves was notified and ordered French admitted to the infirmary. *Id.* At 6:41 p.m. French's blood pressure was 200/138. *Id.* at 29.  Dr. Alves was notified and French was given Norvasc and HCTZ. *Id.* Around 8:42 a.m. the following morning, French's blood pressure was 160/110. *Id.* at 24-26. Dr. Alves was in the infirmary and assessed French, who was given his morning medications. French's

---

[4] Ford explains that K2 is a synthetic form of marijuana commonly abused in prison. ECF No. 30-2 at 12, ¶ 28.

blood pressure and heart remained elevated at rest. *Id.* at 25. Causey took French's blood pressure again around 2:40 p.m.: it was 180/120. *Id*. at 22-23. French refused Causey's effort to take a second blood pressure reading to confirm the finding. *Id*. He was given Cozaar, Norvasc, and HCTZ twice and Meloxicam and doxazosin once on March 7, 2024. ECF No. 30-12 at 24, 26, 28, 30, 32.

When RN Post saw French on March 8, 2024, around midnight, he refused to have his blood pressure checked until someone got his "medications straightened out." ECF No. 30-4 at 19. Causey saw French around 12:38 p.m.. His blood pressure was 120/80. *Id.* at 16-18. Causey noted the French was compliant with his medications that morning, that CRNP Stephanie Cyran was aware of his blood pressure, and French was to be discharged. *Id*.

While Dr. Alves[5] does not have any memory of French or his stay in the infirmary, he reviewed his medical records, and explains that if French was in the infirmary for blood pressure reduction and control, there is a process for that including adjustments in medication dosage until a low enough blood pressure is obtained: thereafter, further medication adjustments can be made safely with the patient in their housing unit. ECF No. 30-15, ¶ 5. Dr. Alves further explains that when treating someone in the infirmary, he attempts to handle as many issues as possible during their stay. Had French complained about thumb pain, he would have immobilized the thumb, ordered an x-ray, and addressed his pain. *Id.*, ¶ 6.

Dr. Alves also explains that it was safe to discharge French from the infirmary on March 8, 2024, and there is no reason to question the accuracy of his blood pressure reading that day. ECF No. 30-15 at 4, ¶ 11. "[A]fter three days in the hospital and three days in the infirmary on several

---

[5] Dr. Donald Alves avers that he was employed by YesCare Corp. as the Medical Director at ECI from December 4, 2023 through July 31, 2024, and is currently employed by Centurion as the Eastern Regional Medical Director at ECI. ECF No. 30-15 at ¶ 2.

antihypertensive medications, it would not be unusual for the patient's BP to normalize." *Id*. As to French's allegation that RN Causey attempted to give him two clonidine pills on March 8, 2024, Dr. Alves states that there is no order for that in the record, but if he was given clonidine, it would be reasonable for his blood pressure to be 120/80. *Id*. In sum, Dr. Alves avers that in his medical opinion, a blood pressure reading of "120/80 would not have been unexpected on March 8, 2024." *Id*.

NP Cyran[6] avers that she has does not specifically recall anything about French or his allegations. ECF No. 30-16 at ¶ 5. However, occasionally nursing staff reviewed patients with her who needed assessment or care in the infirmary. *Id*. Cyran does not remember RN Causey discussing French with her, and denies ever seeing French or providing any care to him. *Id*. Further, Cyran specially denies prescribing or ordering clonidine and notes that there is no evidence in French's medical records that clonidine was prescribed. *Id*. Additionally, Cyran states that if a nurse tells her a blood pressure reading and Cyran expresses she is aware of it, she trusts the nurse to put the correct value in the chart. *Id*. Cyran denies that she would ever approve falsifying data in order to discharge a patient from the infirmary early. *Id*.

RN Causey[7] also does not specifically remember French or his stay in the infirmary but also reviewed his medical records. ECF No. 30-17 at ¶ 5. Causey avers that if French told her he had been assaulted and required treatment, "it would make sense for me to inform him that he would see a provider." *Id*. She explains that as a registered nurse, she cannot diagnose, order

---

[6] Certified Registered Nurse Practitioner Stephanie Cyran was employed by YesCare Corp. as a CRNP at ECI until July 31, 2024. On August 1, 2024, Centurion replaced YesCare as the contracted medical care provider and she currently is employed by Centurion as a CRNP at ECI. ECF No. 30-16 at ¶ 2.

[7] Sharon Causey is a Registered Nurse employed by YesCare Corp. as an RN at ECI infirmary until July 31, 2024 and continues to work for Centurion as an RN in the ECI infirmary. ECF No. 30-17 at ¶ 2.

treatment, or prescribe medication. *Id*. The medical records demonstrate that Dr. Alves assessed French in the infirmary on March 7, 2024. *Id*.  Additionally, Causey specifically denies falsifying French's blood pressure reading. *Id*., ¶ 6. Causey explains that French's blood pressure reading of 120/80 on March 8, 2024 was completed manually and was accurate and correct. *Id*. ¶ 7.  She does not recall whether she attempted to give French clonidine on March 8, 2024 as alleged, but explains that her usual practice is to document the medications she is directed to administer and there is no record that this medication was ordered or administered. *Id*., ¶ 7. Causey explains that she would have only given clonidine pursuant to a valid order by a provider. *Id*.  She further explains that it would have made sense for a provider to order a one-time dose of clonidine given the report that French's blood pressure was high the day before, as clonidine can rapidly decrease blood pressure. *Id*.  Causey further explains that given that March 8, 2024, was French's third day in the infirmary taking hypertension medications, it would not be unusual for his blood pressure to normalize by then. *Id.*

On March 15, French filed a sick call slip, which was received by the medical department on March 17, 2024, complaining that he suffered a medical incident on March 3, 2024, and he awoke with a number of unspecified injuries. He stated that he was experiencing pain and complications in healing. ECF No. 30-7 at 15. He wanted to have his injuries documented because he did not know what happened to him. *Id*. A notation on April 13 stated he was not seen because he was transferred. *Id*.

The medical department received another sick call from French that day, dated March 14, 2024, regarding the status of  his chlorthalidone prescription. *Id*. at 19. Because he also requested a copy of his medical records, the sick call was forwarded to the medical records department. *Id*.

16

Additionally, on March 17, 2024, French saw RN Johnson due to complaints of chest discomfort caused by pepper spray exposure. ECF No. 30-4 at 14-15. His blood pressure was 160/100. He reported that he was compliant with his hypertension medications. He was not in acute distress but complained of mild chest discomfort. He did not have any shortness of breath or coughing. He was directed to take Excedrin as ordered. *Id*.

On March 22, 2024, the medical department received a sick call from French dated the preceding day, requesting medication refills and inquiring as to the status of his chlorthalidone prescriptions. ECF No. 30-7 at 18. The next day he was issued Excedrin ES, Tylenol ES, Zocor, Cozaar, and HCTZ as KOP prescribed through June 15, 2024. ECF No. 30-12 at 20, 22, 24, 30.

On March 26, 2024, the medical department received a sick call from French, dated the preceding day, wherein he stated it was his second sick call regarding injuries received on March 3, 2024. ECF No. 30-7 at 14. French's sick call slip dated March 28, 2024, received by medical on March 30, 2024, concerned his being scheduled for a chronic care follow-up for numerous concerns regarding his medications and blood pressure. *Id*. at 17. On April 4, 2024, French submitted a sick call asserting it was his third sick call regarding his left thumb being broken on March 3, 2024. *Id*. at 16.

On April 12, 2024, French did not appear for his appointment with a provider. ECF No. 30-4 at 11. He was also scheduled for nurse sick call in response to his sick call about injuries received March 3, 2024, however he was not seen due to his transfer to the East compound *Id*. at 12-13.[8] The following day, French again did not appear for his appointment with a provider because of his transfer. *Id*. at 10.

---

[8] Ford contextualizes French's medical records, explaining that French was scheduled for appointments but was not seen because he had transferred to ECI-East from ECI-West. ECF No. 30-2 at 15, ¶ 33.

17

On April 19, 2024, the medical department received French's April 15 sick call stating that it was his fourth sick call regarding a broken thumb and other injuries sustained on March 3, 2024. The sick call also requested he be seen in chronic care and his prescriptions be refilled. ECF No. 30-7 at 13. That same day, the sick call was marked resolved. *Id*.

On May 9, 2024, French had lab work done. ECF No. 30-14 at 13-16.

On May 16, 2024, Adrion saw French for a blood pressure check: his blood pressure was 130/84. ECF No. 30-4 at 8-9. On May 21, 2024, French had another blood pressure check. He reported not taking his blood pressure medication before the visit. His blood pressure was 149/96. *Id*. at 6-7. French was educated on the importance of taking his medications as prescribed and eating a low sodium/heart healthy diet. *Id*.

On June 2, 2024, French received Excedrin ES, Tylenol ES, Zocor, Cozaar, Meloxicam, and Norvasc KOP as prescribed through June 15, 2024. ECF No. 30-12 at 20-37.

The following day, the medical department received a sick call from French dated May 31, 2024, in which he requested medication refills. ECF No. 30-7 at  12. The response noted that his medications were refilled on June 1, 2024. *Id*.

On June 27, 2024, RN Johnson evaluated French after a use of force involving pepper spray. ECF No. 30-4 at 4-5. French was in severe distress and his blood pressure was 200/120. He did not complain of pain but accepted Tylenol. RN Johnson wiped his eyes and nose  with a paper towel. No other injuries were noted, and French denied other injury. *Id*. at 5.

On July 2, 2024, French was issued HCTZ and doxazosin KOP through July 3, 2024. ECF No. 30-12 at 30, 32. The next day, French submitted a sick call stating his finger was broken and he needed his medications that had expired on June 15 renewed. ECF No. 30-7 at 7. The response noted that his medications were renewed that day. *Id*.

18

Ford avers that there is no medical record of his seeing French on July 3, 2024 for a chronic care visit, and does not recall seeing French on that date as French alleges.  ECF No. 30-2 at 16, ¶ 37.

On July 15, 2024, the medical department received a sick call from French dated the preceding day, complaining that between June 27, 2024 and July 1, 2024, he was put in a filthy room while naked and contracted ringworm or bacteria on his privates. ECF No. 30-7 at 11. He also complained that something in his current cell was biting him. He asked for ointment, noted that he was still waiting on an x-ray of his broken left thumb, and requested strong pain medication. The response noted that he had a nurse visit on July 14, 2024. *Id*.

French submitted another sick call slip on July 23, 2024, regarding an x-ray for his thumb, a rash on his genitals, and a request for increased pain medication.  *Id*. at 8. A nurse responded to the sick call the same day, noting that French was scheduled for provider sick call on July 26, 2024. *Id*. There is no record, however, of a provider visit taking place on July 26, 2024. ECF No. 30-2 at 17, ¶ 39.

Ford evaluated French for chronic care on July 31, 2024. ECF No. 30-3 at 35-36; ECF No. 30-4 at 1-2. French reported compliance with his hypertension medication and Ford reordered his medications and labs be repeated before his next chronic care appointment. French's blood pressure was 136/78. Ford assessed French as having hypertension and a crushing injury to his left thumb, sequela. Ford ordered x-rays of his fingers. He prescribed Cozaar, Excedrin ES, HCTZ, Meloxicam Norvasc, Tylenol ES, and Zocor, all KOP through November 30, 2024. *Id*.

Ford explains that although he ordered the x-ray of French's fingers, the x-ray would need to be scheduled. ECF No. 30-2 at 17, ¶ 39.  There is no radiology report demonstrating the x-ray was completed and Ford does not know why that did not occur. *Id*.

Ford explains that on August 1, 2024, Centurion replaced YesCare as the contracted health care provider. ECF No. 30-2 at 17, ¶ 39.  The following day, French was issued Zocor, Tylenol ES, Norvasc, Meloxicam, HCTZ, Excedrin ES, and Cozaar KOP as had been prescribed. ECF No. 30-13 at  17, 19, 21, 23, 25.

On August 12, 2024, Adrion saw French in sick call for his complaints of an itch and rash to his genitals. ECF No. 30-3 at 31-34. His blood pressure was 118/82. He stated his belief that officers broke his thumb on March 3, 2024. He reported pain in the thumb only with contact and that Mobic and Tylenol brought the pain down to a four out of ten.  On examination, Adrion noted tenderness, palpable distal pulses, pain with movement, intact sensation and weakness. There were no spasms or discoloration. The thumb was warm to touch. Although there was no tingling, numbness, or swelling, French was unable to bend the left thumb. Additionally, French reported itching to his genitals for two weeks that started one week after he was placed on staff alert on July 27, 2024. Adrion noted no evidence of infection. She assessed tinea (jock itch), and prescribed an antifungal (tolnaftate). *Id*. French received the antifungal cream KOP on August 17, 2024. ECF No. 30-13 at 25.

Adrion avers that when she evaluated French on August 12, 2024, she noted that he had been seen by a provider on July 31, 2024, and that as of the signing of her declaration he had not required an x-ray. ECF No. 30-18,¶ 11. As a result of the August 12 encounter, Adrion ordered an antifungal topical cream, which was on the list of medications that nurses could order without direct contact with a provider. *Id*.  French's pain was well managed with already-prescribed medications and Adrion avers that French was not "a suitable candidate for stronger pain medication due to abuse of previous medication such as aspirin and illicit drug use of K2." *Id*.

Additionally, Adrion explains that x-rays require provider orders and as a registered nurse she was not able to order an x-ray. She did, however, order follow-up with a provider. *Id*.

On August 22, 2024, French did not appear for his appointment with a provider due to "custody." ECF No. 30-3 at 30. On August 23, 2024, he again failed to appear for his appointment with a provider, this time the reason was noted as "chapel." *Id*. at 29.

On October 21, 2024, French submitted a sick call requesting medication refills. ECF No. 30-7 at 6. The response dated October 22, 2024 noted that medications were refilled. *Id*. On October 24, 2024, French was issued Zocor, Tylenol ES, Norvasc, Meloxicam, HCTZ, Excedrin ES, and Cozaar KOP as prescribed. ECF No. 30-13 at 17, 19, 21, 23, 25.

On October 28, 2024, Dr. Dereje Tesfaye evaluated French via telemedicine for chronic care with a nurse assisting the physical examination. ECF No. 30-3 at 23-26. Dr. Tesfaye noted that he reviewed French's labs with him and provided education. His blood pressure was 160/98, and Dr. Tesfaye increased Norvasc to 10 mg (although it was already prescribed as 10 mg) and ordered a follow-up blood pressure check in one week. Dr. Tesfaye educated the patient on home exercise and portion reduction. He prescribed a combination of atenolol 50 mg-chlorthalidone 25 mg and Cozaar 100 mg, both KOP through February 24, 2025. French already had active prescriptions for doxazosin 2 mg, Excedrin ES, HCTZ 25 mg, Meloxicam 7.5 mg, Norvasc 10 mg, Tylenol ES, and Zocor 40 mg. *Id.*

Dr. Tesfaye updated French's chart on November 4, 2024, reflecting French's blood pressure was 142/100. ECF No. 30-3 at 20. French advised he was not getting his atenolol, and Dr. Tesfaye noted the nurse was going to investigate and resolve the issue. He ordered another blood pressure check in one week. *Id*. Dr. Tesfaye also submitted a nonformulary drug request for the combination atenolol 50 mg/chlorthalidone 25 mg for 120 days. *Id*. at 21-22. The pharmacy

responded that each medication was available separately on the formulary and requested that Dr. Tesfaye order them separately. *Id*. On November 7, 2024, French was issued atenolol KOP. ECF No. 30-13 at 35.

On November 11, 2024, French's blood pressure was 130/90, and Dr Tesfaye ordered a follow-up chronic care clinic in 90 days. ECF No. 30-3 at 19.

On November 15, 2024, medical received French's November 14 sick call wherein he stated that he felt like he had parasites growing inside him, like he was trying to pass a worm out of his eye/ear/nose and, like a tapeworm or some wormlike parasite. ECF No. 30-7 at 5. He was evaluated in sick call that day. His blood pressure was 134/74.  ECF No. 30-3 at 16-18. He was referred to the onsite provider, NP Roderer, who ordered blood and stool work up. *Id*. at 12-15.

On November 20, 2024, French submitted a sick call referring to his November 15 sick call visit and requesting guaifenesin for cold symptoms and something to put the stool sample into. ECF No. 30-7 at 4. On November 25, 2024 an occult blood card was completed and tested and was negative. ECF No. 30-3 at 11. On November 26 and 28, 2024, French was provided guaifenesin twice daily as prescribed by Dr. Alves. ECF No. 30-13  at 35.  On November 29, 2024, he was issued guaifenesin KOP. *Id*.

On December 19, 2024, medical received a sick call from French dated December 17, 2024, concerning the expiration of his medications on November 30, 2024 and requesting refills. ECF No. 30-7 at 3. That same day, RN Johnson responded that the medications were reordered and providers renewed the medications that had expired. *Id*. French was issued atenolol, Norvasc, and Cozaar KOP, that same day, all prescribed from December 19, 2024 through April 17, 2025. ECF No. 30-13 at 37; ECF No. 30-14 at 2. On December 22, 2024, French was issued Excedrin ES,

Tylenol ES, Meloxicam, and Zocor KOP, all prescribed from December 19, 2024 through April 17, 2025. ECF No. 30-13 at  35, 37; ECF No. 30-14 at 2.

On January 7, 2025, RN Joshua Nicholas saw French in sick call. ECF No. 30-3 at 8-9. He came to medical in a wheelchair complaining of difficulty walking. He stated that he had been working out around Christmas Eve doing leg lifts and then experienced pain in his hip the next day that prevented him walking long distances. On examination, he appeared to have a tight hip muscle and pain with hip flexion. He could stand and walk to the scale with a slight limp.Nicholas consulted with Ford and Ford prescribed prednisone for 5 days and bedrest/feed in for 10 days. *Id*.

Dr. Tesfaye saw French on January 24, 2025, via telemedicine for chronic care with a nurse assisting in the physical examination. ECF No. 30-14 at 6-9. French's blood pressure was 134/90 and he offered no complaints. Dr Tesfaye renewed his medications and ordered a follow-up chronic care clinic in 90 days. *Id*.

Ford avers that he never ignored French's medical needs. ECF No. 30-2 at 21, ¶ 51. Ford renewed French's medications any time he was aware they needed to be renewed. There were, however, occasions where French did not request refills of his medications before they expired. *Id.*  Additionally, Ford explains that any delays in French being seen for provider or chronic care visits were due to circumstances beyond Ford's control. *Id.*  Sometimes French was scheduled for provider appointments but did not come to the appointments. Some of those missed appointments were because French had been transferred to the other ECI compound. *Id.*

## Legal Standards

### I.    Federal Rules of Civil Procedure 12(b)(6) and 56(a)

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief

above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). The Court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56(a). A motion styled in this manner

implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for a court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; a court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261. Because Defendants styled their motion as a motion to dismiss, or in the alternative, for summary judgment, French was on notice that the Court could treat the Motion as one for summary judgment and rule on that basis. As Defendants have submitted materials outside the pleadings, the Court will construe their Motion as one for summary judgment.

## II.    Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate

indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

After a serious medical need is established, a successful claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "Actual knowledge or awareness on the part of the alleged inflicter … becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective

knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

If the required subjective knowledge is established, a defendant may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)) *see also Jackson*, 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (transgender inmate stated plausible claim in alleging defendant's refusal to evaluate her for gender reassignment surgery where current therapy failed to alleviate urge for serious self-harm).

## Discussion

Defendants assert that they are entitled to dismissal of the Complaint pursuant to Federal Rule 12(b)(6) or, in the alternative, to summary judgment pursuant to Rule 56 because Defendants were not deliberately indifferent to French's medical needs under the Eighth Amendment. Defendants contend that French has failed to state a claim of deliberate indifference against

YesCare, Dr. Alves, and NP Cyran and the record shows that none of the individually named medical providers were deliberately indifferent. ECF No. 30-1at 27-36. Additionally, Defendants contend that French's state law medical malpractice claims should be dismissed. *Id*. at 36-38.

A.    **YesCare**

As to YesCare, nothing indicates that any delays in medical care were caused by a custom or policy of the contracted medical provider.  In the case of *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), the Supreme Court held that local governmental entities may be liable under § 1983 based on the unconstitutional actions of individual defendants where those defendants were executing an official policy or custom of the local government that violated the plaintiff's rights.  *Id.* at 690–91.  The *Monell* Court explained that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).

*Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers.  *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 49 (1988); *Polk Cnty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999). Thus, those standards applicable to municipalities apply with full force to YesCare. *See Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal liability "'apply equally to a private corporation'" acting under color of state law) (citation omitted).

A viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v.*

*Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). The thrust of French's argument is that he was not seen by a chronic care provider as often as he should have been to monitor his blood pressure; renewal of his medications did not occur automatically; and he did not receive proper care regarding an injury to his thumb. However, he fails to allege, that any of the foregoing was a result of a custom or policy enforced by YesCare. Accordingly, the complaint is dismissed as to YesCare.

### B.    NP Cyran

French does not assert that he was ever seen by Cyran, but rather asserts that she was aware of his blood pressure while he was in the infirmary and instructed Causey to give him clonidine, a medication used to lower blood pressure. French does not allege that Cyran was aware of a risk of harm to French and disregarded that risk. As such, the claims against Cyran must be dismissed.

### C.    Defendants Causey, Alves, Ford, Adrion

**The remaining defendants provided medical care to French. Their actions, as to the various medical conditions French cites, will be analyzed under the summary judgment standard.**

### 1.    Thumb Injury

In his complaint, French asserts that he attempted to alert Causey about his injuries arising from the March 3 assault, but she told him he would need to see a provider. ECF No. 18 at 12-13. While Causey does not recall French, she avers that it would make sense for her to inform French that he would need to see a provider because as a registered nurse she cannot diagnose any medical condition, order treatment, or prescribe medication. ECF No. 30-17 at ¶ 5. Her decision to allow a provider to assess French and determine a course of treatment does not establish her deliberate indifference to a serious medical need.

As to Dr. Alves, French claims that he only treated his high blood pressure while he was in the infirmary and refused to address any of his other concerns.  ECF No. 18 at 12-13. First, there is nothing in French's medical records demonstrating that he had an injury to his thumb when he was in the infirmary.  The medical reports prepared after the altercation with staff on March 3 do not list an injury to his thumb. More importantly, there is no evidence that French complained during his hospital or infirmary stay of an injury to his thumb. French received round- the-clock care at both the hospital and in the ECI infirmary and there is simply no record evidence that during that time he ever complained of an injury to his thumb. Lastly, Dr. Alves explains that if he had been made aware of an injury to French's thumb while he was in the infirmary he would have endeavored to treat the injury.  ECF No. 30-15 ¶ 5. French has not come forward with any evidence to refute the medical record or Dr. Alves's declaration and Dr. Alves is therefore entitled to summary judgment.

The first time French complained about his thumb was on April 4, 2024, a month after the injury was allegedly received.  ECF No. 30-7 at 16. French's complaints about his thumb were inconsistent, sometimes being referenced in sick call slips, other times not, and rarely being raised when he saw a health care provider.

On July 31, 2024, Ford assessed an injury to French's thumb and ordered an x-ray, however for unexplained reasons the x-ray was not taken. ECF No. 30-3 at 35-36; ECF No. 30-4 at 1-2. While it is unfortunate that the x-ray was not taken as ordered, there is no evidence that Ford was responsible for that error. As such, he is entitled to summary judgment on this claim.

Lastly, contrary to French's assertions, the record demonstrates that Adrion did notify the hospital of his injuries sustained in the March 3, 2024 incident, both orally and in writing.  French claims that because he was sedated he could not notify the hospital of his injuries, but the evidence

30

shows that he was back to his baseline on March 4, 2024 and was not discharged from the hospital until March 6, 2024. He did not make any complaints about his thumb during that time.

Additionally, Adrion saw French on August 12, 2024, and noted then that he complained of pain in his thumb which was relieved by analgesic medication. He was unable, however, to bend the thumb. Adrion, a registered nurse, was not authorized to order an x-ray, but he noted that French was scheduled to see a provider the following day. Unfortunately, for reasons not attributable to any of the named Defendants, French did not appear for his scheduled appointment. On this record, Adrion is entitled to summary judgment regarding French's claims regarding the treatment of his thumb injury.

While there was a delay in providing French with an x-ray of his thumb, nothing in the record shows that this action was taken by any of these defendants "for the very purpose of causing harm or with knowledge that harm [would] result." *Farmer*, 511 U.S. at 835. Summary judgment is therefore appropriate as to the claims related to his thumb injury.

## 2.  Blood Pressure Management

While it is clear that French's prescriptions to treat his high blood pressure lapsed, it is also clear from the record that he failed to timely request renewal of his medications before they expired, despite his having been educated on the refill process. Additionally, while chronic care appointments are ideally scheduled every 90 days (ECF No. 30-2, ¶ 7), the schedule is made by nursing staff and depends on the number of patients, provider hours available, emergencies, and facility lockdowns. *Id*. There is no dispute that French did not have a chronic care visit from August 4, 2022 until July 3, 2023, and that after the July 3 visit he was seen on December 7, 2023, February 5, 2024, July 31, 2024, October 8, 2024 and January 24, 2024. Throughout this time period, however, he was also seen for other provider and nurse visits. Additionally, there is no evidence

that he was harmed by the delay in seeing his chronic care provider. While he complained of occasional headaches, the records demonstrates he had access to pain medications.

As to French's claim that Ford interfered with French's chronic care visits because they got into an argument during the August 2022 visit, the medical record demonstrates that contrary to French's claim, Ford ordered a chronic care visit after that encounter. ECF No. 30-2 at 5, ¶ 12. Additionally, Ford avers that he had no control over when a patient is scheduled for a visit. ECF No. 30-2 at 3, ¶ 7. French's claim regarding Ford's interference with his chronic care visits is belied by the record and Ford is entitled to summary judgment on this claim.

Next, French claims that Ford saw him on July 3, 2024 and French complained about his left thumb, genital rash, and need to renew his blood pressure medication, but French did not document the encounter and only renewed his medications. While there is no record of this encounter, and Ford does not recall any encounter with French on that date, French's medications were renewed that day. Assuming, then, that French's allegations are true, they reflect that Ford actually created a treatment plan concerning French's concerns and did not ignore or disregard his medical needs. A few weeks later, on July 31, 2023, Ford had a documented encounter with French where he ordered an x-ray, labs, and reordered his medications. Any delay in French being provided care in July could constitute, at best, nothing more than negligence in carrying out the treatment plan Ford devised at the beginning of the month. Even if negligence can be shown, it does not demonstrate deliberate indifference. As such, Ford is entitled to summary judgment on French's Eighth Amendment claim.

Lastly, French asserts that Causey falsely documented his blood pressure in order to discharge him from the infirmary. ECF No. 18 at 13. Causey denies doing so. Additionally, Dr. Alves and Causey aver that it would not be unusual for French's blood pressure to have stabilized

after his stay in the infirmary where he received his medications properly and consistently. Further, Dr. Alves avers that it was safe to discharge French from the infirmary on March 8, 2024. French has not alleged that he suffered any harm from his discharged (and obviously has adduced no evidence of any harm). As such, Causey is entitled to summary judgment on this claim.

### 3.    Pain Medication and Rash

French claims that Adrion refused to provide him Tylenol or refer him to a provider after she evaluated him on October 30, 2023. ECF No. 18 at 9-10.  But Adrion explains that she did not provide French Tylenol because French was already taking too much aspirin and was supposed to see a provider the following day to discuss his medication. ECF No. 30-18 at 3, ¶ 7.  French had been provided a total of 120 tabs of Tylenol and ibuprofen since September 26, 2023. *Id*.  In order to avoid Tylenol toxicity and/or gastro-intestinal bleeds from overuse of aspirin, Adrion declined to provide more analgesic medication in favor of his discussing his pain management the next day with a provider. *Id*., at 2-3,  ¶¶ 5, 7. The records shows that French was scheduled to see a provider the next day but another nurse inadvertently rescheduled the visit. *Id*., at 3-4,  ¶¶ 8, 9.

Finally, French alleges that Adrion did not provide him any treatment for his genital rash when she evaluated French on August 12, 2024.  ECF No. 18 at 17.  However, the record demonstrates that contrary to French's assertions, Adrion ordered an antifungal ointment and referred French for a follow up with a provider. French already had prescribed analgesic medications to manage his pain.

Simply stated, French disagreed with Adrion as to the course of treatment.  "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)).  French's opinion that Adrion  should have done more  fails to present any exceptional

circumstances. Adrion's actions did not pose a risk of serious or significant injury to French, and she is accordingly entitled to summary judgment.

> **D.    State Law Claims**

In addition to his federal constitutional claims, French asserts state law negligence claims. This Court has original subject matter jurisdiction over any federal claim, pursuant to 28 U.S.C. § 1331(a)(1), which "confers upon district courts 'original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.'" *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012). However, the Court does not have original jurisdiction over French's State law claims, and so the Court is only authorized to resolve those claims pursuant to the grant of supplemental jurisdiction in 28 U.S.C. § 1367(a) which provides that:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Pursuant to § 1367(c)(3), however, a district court "may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction." In *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995), "[T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished." *See also ESAB Grp.*, 685 F.3d at 394 ("Section 1367(c) recognizes courts' authority to decline to exercise supplemental jurisdiction in limited circumstances, including ... where the court dismisses the claims over which it has original jurisdiction."). "[U]nder the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case

34

... provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met." *Hinson v. Norwest Fin. S. Carolina, Inc.*, 239 F.3d 611, 616 (4th Cir. 2001).

In the absence of viable claims that come within federal question jurisdiction, the Court exercises its discretion and declines to exercise supplemental jurisdiction over French's negligence claims which are governed by State law. Therefore, this Court will remand this case to State court.

### E.    Preliminary Injunction

French's request for preliminary injunctive relief is denied. *See* ECF No. 17. A party seeking a preliminary injunction or temporary restraining order must establish: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "All four requirements must be satisfied." *Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 207 (4th Cir. 2014) (brackets omitted) For the reasons discussed above, French has failed to demonstrate a likelihood of success on the merits of his constitutional claims. Additionally, the Court finds that French has failed to demonstrate that he is likely to suffer irreparable harm. As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Grp.,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). The record evidence demonstrates that French is now being seen regularly for the management of his hypertension, that he has some responsibility for the timely refilling of his medications, that he has regularly been provided analgesic medication, and has received an x-ray of his thumb in May. Lastly, French has failed to show that the balance of equities tips in his favor,

or that an injunction would be in the public interest.  Therefore, his request for injunctive relief is denied

**Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss or Alternatively for Summary Judgment, is granted.  French's claims against YesCare and Cyran are dismissed.  Summary judgment is entered on French's federal constitutional claims in favor of Defendants Ford, Alves, Causey, and Adrion and against French.  French's request for injunctive relief is denied. This case is remanded to the Circuit Court for Somerset County for adjudication of French's state law negligence claims. A separate Order follows.

 July 14, 2025                                             /s/
Date                                        Stephanie A. Gallagher
                                            United States District Judge